ATCHISON, T. & S. F. RY. CO. v. COLLINS et al.

SOUTHERN PAC. CO. v. SAME.

(District Court, N. D. California, N. D.)

Nos. 871, 872.

1. Taxation ⊙⇒8—Tax on gross earnings of railroad not invalid because of federal franchises held by railroad.

Tax on property of a railroad in California, measured by the gross revenue imposed by Const. art. 13, § 14, was not invalid by reason of federal franchises held by the railroad.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Taxation ⬥40(1)—Courts will not interfere on ground of inequality, unless the result of misapplication of law, willful discrimination, or gross carelessness implying fraud.**

In jurisdictions in which the equality of taxation is expressly required, the courts will not interfere to grant relief, except in a case where inequality is the result of a misapplication of the law, a willful discrimination, or of such gross carelessness as to imply fraud.

3. **Taxation ⬥4—State has power to impose taxes commensurate with its needs.**

A state has a wide range of power in imposing taxes, a power commensurate with its needs.

4. **Taxation ⬥42(1)—State may classify property for taxation purposes and distribute burden unevenly.**

A state, for the purpose of taxation, may classify property and distribute the burden somewhat unevenly.

5. **Commerce ⬥73—State not empowered to impose on railroads engaged in interstate commerce a tax so oppressive as to constitute a burden on interstate commerce.**

Under Const. Cal., art. 13, § 14, imposing an annual tax on railroad properties measured by the gross revenues earned on both intrastate and interstate business, the state, though empowered to make such classification and to place a burden on railroads greater than that placed on other property for the purpose of taxation, was not empowered to make such burden so grossly excessive or disproportionate as to constitute a burden on interstate commerce, in violation of the interstate commerce clause; a tax so oppressive being in effect a tax on interstate commerce.

6. **Commerce ⬥73—Evidence held insufficient to prove state tax on railroad property based on gross earnings so oppressive as to constitute in effect a tax on interstate commerce.**

In actions by railroads to enjoin collection by the state of California, under Const. Cal. art. 13, § 14, of a tax of 7 per cent. on the gross revenues earned within the state on both intrastate and interstate business, evidence *held* insufficient to prove that the tax, compared with that on other property, was so oppressive and disproportionate as to constitute in effect a tax on interstate commerce, in violation of the interstate commerce clause.

In Equity. Suits by the Atchison, Topeka & Santa Fé Railway Company and the Southern Pacific Company, respectively, against Richard E. Collins and others. Complaints dismissed.

See, also, 273 Fed. 1022, 1023.

Max C. Sloss, Guy V. Shoup, and Henley C. Booth, all of San Francisco, Cal., E. W. Camp, of Los Angeles, Cal., and Platt Kent, and D. V. Cowden, both of San Francisco, Cal., for plaintiff.

U. S. Webb, Robert W. Harrison, and Frank L. Guerena, all of San Francisco, Cal., for defendants.

DIETRICH, District Judge. The plaintiffs are railroad corporations owning and operating lines in California, as well as in other states, and doing both interstate and intrastate business. By these suits they seek relief against the collection of a part of the taxes levied against them in California for the year 1921. The defendants are officers of that state. With one exception the two cases involve the same controlling questions, and accordingly they have been submitted together upon a single record.

Under a system of taxation established by an amendment to the Constitution of California, adopted November 8, 1910 (section 14, art.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

13), an annual tax is imposed upon operating railroad properties, measured by and equal to a certain percentage of the gross revenues earned within the state, upon both intrastate and interstate business, the amount of such revenues to be ascertained and computed in the manner prescribed by law. With railroads are classified certain other properties, public utilities, in the main, but not exclusively such, the gross revenues from which, however, are not necessarily subjected to a uniform rate. The revenues thus arising are devoted to the support of the state government, and the entire class is exempt from all local and license taxes. If the revenues thus derived are insufficient for state purposes, an ad valorem tax may be levied upon other property, and other property alone is assessable for local purposes. By referring to San Francisco v. Pacific Tel. & Tel. Co., 166 Cal. 244, 135 Pac. 971, and Pullman Co. v. Richardson, 185 Cal. 484, 197 Pac. 346, and to the decision of the Supreme Court of the United States in the same case, rendered March 12, 1923, 261 U. S. 330, 43 Sup. Ct. 366, 67 L. Ed. 682, those interested may find full expositions of the provisions of the state constitution and statutes. Here it must suffice to say that by the constitutional amendment the pre-existing rule of equality of burden upon all property is abrogated, and a separation is made between state and local taxation as already explained.

Subject to the right of the Legislature from time to time to alter it, the constitutional amendment fixed the rate for railroads at 4 per cent. of the gross revenue. In 1917 (St. 1917, p. 336) the Legislature raised it to 5¼ per cent., and in 1921 to 7 per cent. In the act of 1921 (St. 1921, p. 20), it is elaborately recited that before this new rate was adopted hearings were had, at which all parties interested were given an opportunity to be heard, and that after an extended investigation the conclusion was reached that the tax so imposed would be fair and equitable.

Contending that 7 per cent. is excessive, and imposes a burden grossly disproportionate to that borne by common property, the plaintiffs declined to pay more than at the old rate of 5¼ per cent., and, their tender of the amount so computed having been declined by the state officers, they brought these suits for relief against threatened proceedings for collection. Their applications for preliminary injunctions were denied, but with a proviso that, pending the litigation, they might pay into the state treasury, and the fiscal agents of the state were authorized to receive and give credit for, the portion theretofore tendered, all without prejudice to either party touching the question of the validity of the remaining 1¾ per cent.

[1] The one distinctive issue arises out of the fact that in the Southern Pacific Company case the plaintiff is the holder, by lease or otherwise, of certain federal franchises. It contends that the tax in question imposes a burden upon these franchises, as well as other property owned by it, and that, inasmuch as the franchises are so blended with its other property that the value thereof cannot be segregated or appraised, the entire tax is void, relying chiefly upon California v. Central Pacific R. R. Co., 127 U. S. 1, 8 Sup. Ct. 1073, 32 L. Ed. 150. If the doctrine of this case is not impliedly qualified by later decisions of the Supreme Court, its application would seem to be confined to very nar-

row limits (Chicago, B. & Q. R. R. Co. v. Babcock, 204 U. S. 585, 597, 27 Sup. Ct. 326, 51 L. Ed. 636), and in principle I am unable to distinguish the case here presented from Western Union Tel. Co. v. Taggart, 163 U. S. 1, 16 Sup. Ct. 1054, 41 L. Ed. 49, considered together with Central Pacific R. R. Co. v. California, 162 U. S. 91, 16 Sup. Ct. 766, 40 L. Ed. 903, and Chicago, B. & Q. R. R. Co. v. Babcock, supra, where the taxes assailed were held to be valid. The contention will therefore be denied.

Turning, now, to the question that is common to both cases. It is important that at the outset we have a clear conception of the plaintiffs' position: They make no complaint because of the want of uniformity in the rates imposed by the Legislature upon the several kinds of property embraced in the class with railroads. Impliedly it is conceded that, while these income percentages differ the disparity does not result in inequality, if the burden is considered with reference to the standard of fair valuation. Nor do they contend that inequality of burden, as between their property and common or "local revenue" properties, is violative of any provision of the state Constitution or of the Fourteenth Amendment to the Constitution of the United States. And further they do not contend that the burden imposed upon their property is to be deemed to be a tax upon interstate commerce merely because, in measuring it, resort is had to a percentage of an income that in part comes from interstate commerce; the validity of the mode of making the levy is conceded. As already indicated, they charge (and this is the full scope of their contention) that in point of fact the tax burden thus imposed upon their operating properties within the state of California is grossly disproportionate to that borne by common properties in the state, and in point of law they maintain that, in so far as such burden is excessive, it constitutes a tax upon interstate commerce, and to that extent is void.

[2] Absolute equality of taxation, as we well know, is impossible of attainment. Under an honest and reasonably intelligent administration, inequalities there will be in great number, even within the same taxing unit, and as between different units the disparity is often very great. Hence the familiar rule that, even in jurisdictions where equality is expressly required, the courts will not interfere to grant relief, except in a case where the inequality is the result of a misapplication of the law, or of a willful discrimination, or of such gross carelessness as to imply fraud.

By their proofs, plaintiffs have undertaken to establish the fair cash value of all taxable common property in the state, and to disclose the aggregate amount of the taxes paid thereon for the year; also the fair cash value of their operating properties within the state. The magnitude of these undertakings can hardly be overstated, and such results as have been reached are attributable, in a large measure, to the commendable spirit of fairness and the disposition to waive technicalities characterizing the conduct of all parties. In both processes, that of valuing the common properties and that of valuing plaintiffs' operating properties within the state, there are factors of very great uncertainty, and it is not surprising to find that the opposing experts, each employing competent data and making reasonable computations

and deductions, have reached wholly irreconcilable conclusions, particularly with regard to the fair cash value of the railroad properties.

Assuming for present purposes that a study of the record thus made will lead to the conclusion that, to a degree at least, the plaintiffs' contention of fact is sustained, and that their property is bearing a heavier burden than on the average is borne by the common property, what rule of law are we to apply? Plainly stated, if I rightly understand it, plaintiffs' position seems to be that, in any case of substantial inequality of burden upon property devoted wholly or in part to interstate commerce, the excess tax is void. Upon the other hand, invoking the familiar rule under which a state Legislature may, in the absence of constitutional inhibitions, make reasonable classification and segregation of property for taxation purposes, and noting that the plaintiffs in effect concede the validity of the classification here under consideration, defendants assert that, so long as the classification is exercised uniformly respecting all property within the class, the power of the state is wholly independent of considerations touching other property, and hence the state may impose burdens upon such class commensurate with its needs, regardless of the extent of the burden borne by other property not within the class.

Neither view is thought to be tenable. To maintain the first is in effect to condemn the whole system of taxation under consideration, for it provides no means for securing equality, and if in practice absolute equality ever occurs, it must be deemed to be an accident rather than an achievement. The income percentage is established by the Legislature at infrequent intervals, and that body cannot know what valuations local assessing officers will fix for common property, or what rates local boards will levy, nor can these officers be supposed to know the fair value of railroad property in the state, or what will be the gross income therefrom for the current year. Upon the whole and in the long run substantial equality may be approximated, but to require equality for any single year is to deny the right to classify at all. Moreover, while plaintiffs, in seeking to make a comparison, have taken as a standard the "average" burden upon common property, there is, of course, no such thing in fact as an "average" tax; that is purely a mental conception. So-called "common property" is not a single entity; it is made up of numerous classes and innumerable items. Under the phrase are aggregated innumerable separate, independent parcels of property, separately owned, separately valued, and separately taxed.

If we measure the plaintiffs' burdens by the average, we do not necessarily achieve uniformity. Innumerable common taxpayers may pay more, and innumerable others of such taxpayers may pay less. Again, if, as seems to be assumed by both sides, there is now equality of burden upon all properties within the "state tax" class, and if, by complying with plaintiffs' demand, we reduce the value of their property 25 per cent., manifestly we destroy the existing equality within the class; and, it is to be added, some of the properties so classified would apparently be without remedy, for they have no ground upon which to invoke protection under the interstate commerce clause, the only ground upon which plaintiffs seek to stand.

Touching the defendants' position, that the state, having reasonably classified the property, has unlimited power to tax it, it is necessary only to say that to yield to such a view would be to hold that, so long as reasonable ground for classification can be found, it is competent for the state unreasonably to burden interstate commerce, and even to tax it to extinction. Suppose that in the present case the Constitution of the state had imposed upon this class of property the burden, not only of the state, but of local governments as well, relieving all other property from all tax burdens!

[3, 4] No precedents closely in point have been found. As in substance I stated at the close of the elaborate preliminary hearing, in some of the cases cited there are found expressions sustaining taxes on property of interstate carriers if, as is said, they are levied in good faith, or if they are not oppressive, or if they are not unreasonable exactions, or if they are within reasonable limits. These expressions are all of a general character, and seem very difficult of practical application in the solution of the problem before us; but are they not indicative of some limitation upon the local taxing power in allocating tax burdens to facilities of commerce? The state has a wide range of power in imposing taxes—a power, it may be said, commensurate with its needs. So, too, it may classify property and distribute the burden somewhat unequally. But, upon the other hand, is not the power of the federal government of equal dignity to protect interstate commerce; and such commerce is, of course, dependent upon the facilities or instrumentalities without which it cannot be carried on. Must not the one power be exercised with due regard for the other? May a state, under the guise of classification, needlessly impose upon facilities of interstate transportation a grossly excessive or disproportionate burden? Conceding the propriety of a measure of classification and disparity, may not a point be reached where the inequality is such as to render the burden "oppressive" and to suggest an intentional shifting in fact of the tax to interstate commerce, though in form it is only upon the property employed in carrying it on? If it be conceded that not the inequality of the tax burden, but the effect of the tax upon interstate commerce, and the intent and purpose of the taxing agency towards interstate commerce, are the ultimate inquiries, still, may not inequality, especially if it be gross, be resorted to as material evidence of an intent to oppress interstate commerce and of actual oppression in fact—not conclusive evidence, it may be, but at least a material circumstance?

[5] Upon the whole, I am inclined to think that in no case can the court grant relief from inequality upon the ground here put forward, where such relief would not be available under a system of law expressly requiring equality. It follows that if, taking the view most favorable to plaintiffs, we were to hold that, where instrumentalities of interstate commerce are taxed, the considerations incident thereto have the efficacy of a constitutional requirement of equality, it would still remain true that mere inequality is insufficient to warrant interference by the courts. But, as already intimated, in the absence of such a constitutional provision, it is not thought that the power of the Legislature is so narrowly limited; considerations of interstate commerce alone do not forbid a reasonable range of inequality. This view

is thought to be necessarily implied in the well-established principle of classification for the purposes of taxation. The underlying purpose of classification is segregation and independence of one class from other classes, or of the class from other property. So long as the segregation is made upon reasonable grounds, and all properties within the class, including the instrumentalities of interstate commerce, are treated uniformly, the tax upon such class cannot be held to be an inhibited burden upon interstate commerce, unless it be so great as to be oppressive. In other words, unless unreasonable or oppressive inequality, though designed, will not warrant relief. Vague and uncertain this expression of the principle may be, but I have been unable to find or to formulate a more specific rule.

Aside from the inference that may be drawn from the mere fact of inequality, if inequality be found to exist, there is no evidence—no direct evidence, at least—of the purpose on the part of the Legislature in fixing the rate at 7 per cent. to impose upon the state tax class greater burdens than would be borne by other property. There is a profession of a desire for equality, and ostensibly, at least, a serious effort was made to ascertain a rate that would work out an equitable result. Hearings were had, and an investigation was made, apparently for the purpose of enabling the legislators to exercise an intelligent judgment. That their task was formidable finds abundant support in the record before us, and it must be freely admitted that in the problem there are such variable and uncertain factors that substantial ground for criticism could be found for any conclusion they might reach. It follows that, even had they been subject to a constitutional provision requiring equality, there would be no basis here for granting relief, unless it be found that the 7 per cent. is so grossly disproportionate to the tax upon common property as to imply willful discrimination. Such a finding I am unable to make.

Adequate analysis of the voluminous record upon this issue could hardly be brought within the compass of an opinion of ordinary length, and, besides, the evidence having in the main been taken before an examiner, our findings would be inconclusive upon appeal. Little benefit, therefore, could accrue from an extended discussion. This much, however, may be said: With comparatively unimportant exceptions, both sides have put the substance of the evidence they adduced into tabular form. While these tables may often be illuminated by light from the detailed record, generally speaking, I have found them intelligible in themselves and dependable. As to the aggregate value of the common properties of the state, though at variance, the conclusions reached are not so far apart as to preclude the adoption of some reasonable intermediate figure, with a feeling of confidence that the result would approximate the true value. But when we turn to the plaintiffs' properties the problem is not so simple. It is to be borne in mind that we are concerned with the value of only operating properties, and those portions alone of the operating properties which are in the state of California; but both plaintiffs are possessed of non-operating properties of large, but unestablished, values, and the operating properties within the state are but integral parts of great systems extending into several other states.

Through their experts and in the argument, plaintiffs exhibit studies under the "stock and bond" method, and the "capitalization of net earnings" method of valuation; and the defendant under the "appraisal" or "reproduction cost" method, taking as a basis mainly such appraisals as have been made by and under the direction of the Interstate Commerce Commission. Of the stock and bond method, often easy of application, it is to be said that here the process of computation is necessarily complex, and in it there are factors of great uncertainty. With some qualification the same comment may be made upon the net income method. Incidentally it may be stated that I am unable to concur in the view maintained by the defendants' expert, that in ascertaining the net income for this purpose the gross is not subject to a deduction for tax charges. The appraisal or reproduction cost method always involves some factors of uncertainty, and here certain large factors in the nature of estimates; and generally in its application it entails exercise of judgment upon the part of him who applies it. It is commonly recognized that no one of the methods, standing alone, gives assurance of a dependable result, and that it is safer to take the composite view resulting from a consideration and application of all of them.

I do not think it is a serious objection to the process employed by defendants' expert that he took as a basis of his computations the appraisal made by the Interstate Commerce Commission, or under its direction. The objection is, not that such appraisal is inaccurate or untrustworthy, but that it was made for rate-making purposes rather than for taxation purposes, and that therefore it is incompetent for use in these suits. I am aware that in certain quarters a wide difference of view exists touching this general question. While I am not of the opinion that properly there can be but one valuation, in the long run valuation for rate-making purposes and valuation for taxation purposes should closely approximate each other. There are common factors, and necessarily there is a measure of interdependence. True, by statutory definition and declaration, the two may be entirely segregated, but such segregation would be artificial. It is further true that without the statutory definition, and where the effort is to ascertain a fair value for rate-making purposes and a fair value for taxation purposes, cases may and often do arise where there are differentiating considerations. If the railroads could always make a fair net return upon the fair valuation established for rate-making purposes, and only a fair return, I see no reason why, generally speaking, the fair valuation for such purpose should not also be taken as a fair valuation for taxation purposes. However that may be, considerations of public policy strongly argue for a constant endeavor to keep the two valuations close together. In establishing valuations, there are always two opposing forces—upon the one side the selfish interest of the owners of the utilities, and upon the other side the selfish interest of the public. By recognizing the same valuation for both purposes, the self-interest of the owners tending always to depreciate the value for taxation purposes will be held in check by a like interest tending to appreciate for rate-making purposes, and, upon the other hand, the self-interest of the public tending to appreciate for taxation purposes will be curbed by a like interest tending to depreciate for rate-making purposes.

[6] If the conclusion reached by the expert for the defendant in his application of the appraisal method were taken, admittedly there would be no substantial inequality between the burden borne by common properties and that borne by the plaintiffs' properties. At the time the act under consideration was passed, he was chief engineer for the California Railroad Commission, and it is wholly reasonable to assume, if it is not affirmatively shown, that the legislators were advised of his views and of his valuations, and it could not be said that they acted unreasonably or arbitrarily, if in a large measure they were influenced thereby in adopting the seven per cent. rate. And if here we do not accept his deductions as conclusive, but only give them reasonable weight in the light of and together with the conclusions reached by the witnesses for the plaintiffs in their application of the other two methods of valuation, and thus undertake to get an intermediate or composite view, we would doubtless find some disparity between the burden upon common property and that upon the class of which the plaintiffs' properties form a part, but the inequality would not be so great as to be oppressive, or to imply bad faith or a disposition upon the part of the Legislature to discriminate against the instrumentalities of interstate commerce or to tax such commerce.

Accordingly the complaints will be dismissed.